UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:18-CIV-24020-MORENO/LOUIS

JEAN BAPTISTE JOSEPH,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

_____/

## REPORT AND RECOMMENDATIONS

This matter is before the Court on Movant Jean Baptiste Joseph's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct a Sentence. (ECF No. 1). This case has been referred to the undersigned United States Magistrate Judge by the Honorable Federico A. Moreno, United States District Judge (ECF No. 5). Having carefully considered the Motion, the Response, the testimony advanced at an evidentiary hearing, and the record as a whole, the undersigned recommends that Joseph's Motion be **DENIED**.

## I.     BACKGROUND

Movant Jean Baptiste Joseph was arrested on June 5, 2015 in the bedroom he was renting in Dewayne Murray's residence. Arresting officers saw contraband in the bedroom, including a firearm and suspected narcotics, and seized the evidence. Joseph was charged and later convicted for possessing a firearm after previously being convicted of a felony, possession with intent to distribute ethylone and marijuana, and possession of a firearm in furtherance of a drug trafficking crime (ECF No. 3). In his Motion to Vacate, Joseph contends that his trial counsel rendered deficient performance by failing to call witnesses at a suppression hearing and trial who would

1

have provided testimony favorable to the defense. He also challenges counsel's failure to raise specific arguments at sentencing and on appeal.

### a. Suppression Hearing

On September 24, 2015, Movant filed a Motion to Suppress the physical evidence seized upon his arrest, arguing that the police officers' entry into the residence violated the Fourth Amendment. (CRDE 15).[1] The Court conducted an evidentiary hearing on the motion on October 15 and 20, 2015. The Government called Detectives Miguel Suarez and Alex Barney as witnesses. The following facts were elicited from the Detectives' testimony.

Detectives Suarez and Barney were investigating a robbery and homicide that occurred on March 3, 2015, three months prior to Joseph's arrest. The firearm from the crimes had not been recovered. One participant in the robbery-homicide was arrested in April 2015, and provided phone numbers for Joseph, who was suspected of also participating in the crimes. Detectives obtained a "track and trace" order to pinpoint Joseph's location, and it led them to a home in Miami Gardens.

On June 5, 2015, four police officers, led by Detectives Suarez and Barney, set up surveillance and monitored the home for several hours. During surveillance, a car pulled up to the house, a person went into the home, then left again shortly thereafter. Detective Barney stopped the vehicle and asked the occupant if Joseph was in the house. The driver confirmed that he was.

Detectives then approached and knocked on the front door of the house. (CRDE 35 at 58). Dewayne Murray answered the door and moved outside the home to speak with Detective Barney. (*Id.* at 59). Murray stated he was the owner of the home, confirmed that Joseph was in the home, identified the room in which Joseph was located, and gave police consent to enter the home. (*Id.*

---

[1] Citations to the underlying criminal case are indicated by "CRDE" for the docket entry number in criminal docket Case No. 15-CR-20590.

2

at 60–61). While Murray was speaking with Detective Barney, Detective Suarez saw Joseph in the hallway, (*id*. at 15), and Joseph, after making eye contact with him, went back toward his bedroom. (*Id*. at 16). Detective Suarez entered the home and went to Joseph's bedroom. (*Id.*). Joseph tried to close the door, but Detective Suarez put his foot in the door and entered the bedroom. (*Id.*). Inside, he encountered Joseph and a female occupant, Brittney Harris. (*Id.* at 17). The other police officers, including Detective Barney, entered the bedroom after Detective Suarez. (*Id.*). Police handcuffed Joseph and conducted a visual sweep, upon which they seized the physical evidence in plain view, including a rifle, nearly two-hundred rounds of ammunition, one kilogram of ethylone, and seventy grams of marijuana. (*Id.* at 18–19). After Joseph was transported to the City of Hialeah Police Department, he was provided and signed a consent-to-search form, which allowed police to search the residence and seize additional evidence. (*Id.* at 21). Upon this second search, police uncovered approximately 100 additional grams of ethylone. (*Id.* at 61–63).

The Court found that the officers' entry into Joseph's residence did not violate the Fourth Amendment because both probable cause and exigent circumstances justified their warrantless entry into the residence.[2] (CRDE 68 at 5–8). The Court relied on Detective Barney's and Detective Suarez's uncontradicted testimony noting that he found the testimony credible: "I heard the testimony, without anything to the contrary . . . is not enough for me to conclude that Detective Suarez was not telling the truth. It's not enough for me." (CRDE 90 at 29). The Court ultimately denied Joseph's Motion to Suppress the physical evidence.

---

[2] "After knocking on the door, the police confirmed that Joseph was in the house and obtained consent from the home's owner to enter the home. Exigent circumstances arose when Detective Suarez spotted Joseph and Joseph fled back into his bedroom. At that point, police were certain that Joseph was in the house." *United States v. Joseph*, No. 15-20590-CR-MORENO, 2015 WL 7258515 at *4 (S.D. Fla. Nov. 17, 2015).

### b. Conviction and Sentencing

A jury trial was conducted on November 9 and 10, 2015. The jury convicted Joseph on all three counts and sentencing was scheduled for January 19, 2016. A Pre-Sentence Investigation ("PSI") Report was prepared using the 2015 Guidelines Manual. After considering applicable enhancements, the offense level was calculated as a 28; because Joseph had previously been convicted of at least two other felonies for crimes of violence or controlled substance offenses, he qualified as a career offender and the offense level was adjusted to level 32. Similarly, while his prior convictions resulted in ten criminal history points and a criminal history category of V, because he was a career offender, his criminal history category was assessed as category VI. Federal Sentencing Guidelines Manual § 4B1.1(b) (U.S. Sentencing Comm'n 2016) (hereinafter U.S.S.G.). The PSI additionally summarized pending charges for which he had not yet been convicted, including the homicide committed in February 2015, which Detectives in the present case were investigating at the time of the contested search.

Counsel for Joseph filed objections to the PSI challenging application of the career offender enhancement. Specifically, counsel urged the Court not to rely on the residual clause of the career offender definition in finding that his conviction for battery on a law enforcement officer constituted a crime of violence (CRDE at 75). Alternatively, counsel argued for a downward variance and sentence without regard to application of the enhancement, because the Sentencing Commission had recently voted to delete the residual clause, and other Circuits had expressly disavowed reliance on the career offender residual clause. While acknowledging the Eleventh Circuit's opinion in *Matchett*,[3] counsel argued the precedent did not preclude the Court "from considering alternative challenges to the career offender residual clause not addressed by the

---

[3] *United States v. Matchett*, 802 F.3d 1185 (11th Cir. 2015). The court there rejected a void for vagueness challenge to the career offender residual clause on the basis that the doctrine does not apply to advisory guidelines. *Id.* at 1194.

4

*Matchett* panel," for example, whether the residual clause "is void for vagueness on the ground that it is so standardless that it invites arbitrary enforcement by judges." (ECF No. 75 at 9). Counsel additionally objected to reliance on the prior conviction for battery on a law enforcement officer, in the event the Court did apply the residual clause, for finding that Movant was a career offender, on the ground that the conduct did not present a serious risk of physical injury to another.

The Court rejected Joseph's arguments for a downward variance and against application of the career offender status, explaining that even if he had not qualified for the enhancement, it would yield the same result: "I would say that even if he were not a career offender, I would find that it's appropriate to vary upwards, not just from Criminal History Category III, but even from Criminal History Category VI." (CRDE 93 at 14). The Court expressed the view that considering the severity of the offenses committed and Joseph's extensive criminal history, the appropriate sentence was the harshest permitted by the Sentencing Guidelines. At the hearing, the Court characterized Joseph's offenses as "just way, way too serious." (*Id*. at 18).

The Court sentenced Joseph to a total of 660 months imprisonment: 120 months as to Court 1; 240 months as to Count 2; and 300 months as to Count 3. The Court recognized the severity of the sentence and expressed again the basis for finding it to be the reasonable and appropriate sentence:

> I would impose that kind of sentence even if he were not a career offender, because if he were not technically a career offender, he is an offender who has a career of offending, even if he were not. And the fact that he shows absolutely no remorse and just complains about the lawyers who have fought hard for him is an indication of a refusal to admit any wrongdoing.[4]

CRDE 93 at 18.

At Movant's request, the Court appointed new counsel to represent Joseph on appeal.

---

[4] Joseph used his allocution to the Court to raise his ineffective assistance of counsel claim, noting that he had filed *pro se* objections to the PSI and that all of the assertions made in the PSI were "erroneous."

Joseph challenged his conviction and his sentence on appeal. First, he challenged the Court's denial of his Motion to Suppress. Joseph additionally raised three bases on which he challenged the sentence imposed, specifically, application of the career offender enhancement: that the Court improperly applied the career offender residual clause under U.S.S.G. § 4B1.2(a)(2); that his prior conviction for battery on a law enforcement officer should not have qualified as a crime of violence; and that the Court should have applied the anticipated guideline amendment (Amendment 798), which eliminated the career offender residual clause.

On August 3, 2017, the Eleventh Circuit affirmed his conviction and sentence in a *per curiam* decision that rejected each of Joseph's challenges. *See United States v. Joseph*, 700 F. App'x 918 (11th Cir. 2017). The Eleventh Circuit succinctly rejected the first two sentencing issues as foreclosed by binding precedent. *Id.* at 923. The Eleventh Circuit similarly rejected Joseph's contention that the Court had erred in applying the residual clause of the career offender guideline, which was in effect at the time of Joseph's sentencing, and further refused to consider its application retroactively, because it constituted a substantive change to the guidelines. *Id.*

The Eleventh Circuit further rejected Joseph's argument on appeal that the Court should have applied the Amendment based on the rule of lenity. *Id.* at 923 n.4. The Appellate Court observed that the argument was not raised in the trial court, and that the Circuit had not yet ruled that the rule of lenity applied to the sentencing guidelines. *Id.* Under the plain error standard of review, the appellate court found no error. *Id.*

Finally, the Eleventh Circuit reviewed the sentence for substantive reasonableness and the Court's reasons for imposing the sentence of 660 months:

> given Joseph's extensive criminal record and his complete lack of remorse and unwillingness to accept responsibility. Also, in the light of the severity of Joseph's instant offenses—being a felon in possession of an AK-47 and 200 rounds of ammunition in furtherance of a drug trafficking crime—a lengthy sentence was necessary to promote

respect for the law, to provide adequate deterrence, and to protect the public from future crimes committed by Joseph.

*Id.* at 423. Finding no error, the Eleventh Circuit affirmed.

### c. **Motion to Vacate**

On September 28, 2018, Joseph filed this Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255. (ECF No. 3). Joseph, represented by counsel, moves to vacate his convictions on four grounds of ineffective assistance: (1) trial counsel was ineffective for failing to call witnesses Dewayne Murray[5] and Brittany Harris at the suppression hearing; (2) trial counsel was ineffective for failing to call Brittany Harris at trial; (3) trial counsel was ineffective because she failed to argue that the trial court should have applied Amendment 798 at sentencing; and (4) appellate counsel was ineffective because he failed to raise in his initial brief that Joseph's sentence violated the Eighth Amendment.

Joseph attached Murray's and Harris' affidavits in support of his claims of ineffective assistance of counsel (ECF No. 3, at 33, 34). In his affidavit, Murray affirmed that he never gave police consent to conduct their initial entry into the residence, that he never told police he was renting a room to Joseph, and that he never told the officers Joseph was inside the residence. Murray also stated that he was never contacted by Joseph's trial attorney to be interviewed or called as a witness. Brittany Harris attested in her affidavit that Joseph was in bed next to her when police forced open the closed bedroom door, and, furthermore, that no weapons or drugs were in plain view in Movant's bedroom.

Joseph argues that the witnesses' testimony would have cast into doubt the officer's testimony that Movant was actually observed inside the home from the open front door, thereby

---

[5] The Motion mistakenly identifies the uncalled witness as Dewayne "Miller," but it clearly refers to the homeowner, Dewayne Murray.

precluding the establishment of exigent circumstances justifying the officers' entry into the home. He further contends that the officers' entry into the home may have been found to constitute a Fourth Amendment violation, the physical evidence obtained would have been suppressed, and the case would have been dismissed.

Movant advanced facts which, if true, would warrant habeas relief and accordingly, warranted an evidentiary hearing. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991). Specifically, based on the affidavits advanced with the Motion, Harris's and Murray's testimony would have contradicted nearly the entirety of the police officers' testimony creating the exigent circumstances the district court found to justify the officers' entry into Movant's residence by indicating an alternative sequence of events. Because the record contained no information signaling counsel's reasoning for not calling these witnesses, the undersigned set an evidentiary hearing (ECF No. 15). A summary of the testimony and evidence received follows.

### d. Evidentiary Hearing

The evidentiary hearing began on January 14, 2020 and was continued to February 27, 2020.[6] The Court took testimony from Assistant Federal Public Defender Abigail Becker, who represented Joseph at trial; Dewayne Murray, Brittany Harris, and Movant Joseph.

### 1. Abigail Becker

Assistant Federal Public Defender (AFPD) Abigail Becker testified at the evidentiary hearing on January 14, 2020. Becker testified that she was one of two lawyers who represented Joseph at trial; both AFPD's had equal responsibility in Joseph's representation.

---

[6] At the evidentiary hearing on January 24, 2020, defense counsel made an *ore tenus* motion to continue the hearing on the basis that she had not spoken to Joseph and because Brittany Harris, who resided out of state, was not in Miami. The Government objected to the continuance. The undersigned granted the motion in part, in order to permit defense counsel to call Harris and Joseph as witnesses. The undersigned additionally permitted supplemental briefing between the two hearings.

Becker described her steps to prepare for the hearing on the motion to suppress. She instructed an investigator to collect documents about the property where the search occurred and to locate potential witnesses. She met with Joseph five times. She met with witnesses Brittney Harris and Ashley Charles, Joseph's girlfriend. She tried to locate Dewayne Murray, who she identified through discovery propounded by the Government, specifically, the consent-to-search form that Murray executed, which identified Murray as the owner of the residence.

Becker described the steps she and her trial partner took to find Murray. She testified that she asked her client for Murray's contact information. Becker also asked Joseph's brother for Murray's number. She and her trial partner went to the residence in Miami Gardens a couple of times and did not find Murray there; they spoke to someone there, who would not or could not tell them anything about who lived there. She conducted a search on the database, Accurint, and found a phone number for Murray. Becker testified she tried the number several times. Becker also located a phone number for Murray's mother, who jointly owned the residence with him, and another address for his mother in West Palm Beach. Becker directed an investigator to drive to Murray's mother's residence in West Palm Beach and was unsuccessful in finding her there. Becker identified another phone number for Murray on the arrest form from the date of the search, and that too was unsuccessful.[7] At the hearing, Becker read both phone numbers that she used to try to reach Murray from her file into the record.[8] Becker called the attorney representing Murray in relation to the state charges, and was still not able to reach him.

Becker told her client that they had been unable to find Murray and asked him for a phone number, which Joseph was unable to provide. Becker testified that her efforts to locate Murray were conducted without knowing what he would say about the search; she did not know that he

---

[7] Murray was arrested on the date of the search on unrelated charges that were later dropped by the State.

[8] When he testified, Murray verified that both were accurate—one was his phone number, the other was his father's.

would testify that he had not given consent to entry, or that he would deny that he told officers that Joseph was home. Becker acknowledged that if Murray would have testified that he did not give consent to law enforcement, it could have changed the outcome. Ultimately, Becker testified that counsel felt that they could go forward without Murray, in part because they did not know what he would say if called to testify. Even if she had known that he would have testified that he had not given consent, Becker explained she would not have called him without first having a chance to interview him to assess his demeanor and credibility as a witness.

Becker further testified that she was aware that Brittany Harris was available as a witness for the suppression hearing. Becker testified that she interviewed Harris in person and also spoke to her on the phone.

Becker summarized the statements Harris provided in pre-hearing interviews. Relevant to the suppression issues, Harris told counsel that Joseph was in the room when police entered the house. She also told the attorneys that Joseph had opened the bedroom door. Becker had concerns about Harris' clarity of memory and opportunity to observe what she described, as she also told the attorneys she had been sleeping when the events occurred.

Becker viewed Harris' greatest value to Joseph's defense as being able to introduce that phone call to refute the anticipated testimony from law enforcement that they found the narcotics in plain view. Harris had asked Joseph in a recorded call from jail about the contraband items found in his bedroom during the search, expressing incredulity that he would have had those things in plain view.  Becker explained that based on her conversations with Harris, she was not sure that Harris would hold up on cross-examination and she did not want to "burn her" as a witness before trial. Specifically, Becker was concerned that Harris' testimony at the suppression hearing would be used to impeach her at trial if she testified differently at the two proceedings, and Becker viewed

Harris' greater value in the case as a trial witness.

### 2. Dewayne Murray

At the evidentiary hearing Murray testified that he is 27 years old, has never been convicted of a felony crime, and works as an EMT. At the time Joseph was arrested, Murray jointly owned the subject residence with his mother, and was responsible for paying the mortgage on the property, property taxes, and all bills associated with the property. Murray described his relationship with Joseph as close. Murray testified that in June of 2015, he was renting a room inside his house to Joseph.

On the morning of June 5, 2015, Murray woke up between 6 and 7 AM because his friend was going to pick up something from him. His friend arrived at the residence and left shortly thereafter. Murray did not see Joseph during the time that the friend was at the house, nor did he see Joseph's car parked in the front of the house. After Murray's friend left, Murray went back into his bedroom. Minutes later, there was a knock at the front door. Murray believed it was his friend who had returned. When Murray opened the front door, he saw officers from Hialeah and Miami Gardens Gang Unit. Murray put his arms in the air and the officers grabbed him, placed him on the floor, and handcuffed him. The officers asked Murray if Joseph was inside the residence to which Murray responded that he was not. Murray testified that he did not grant the officers consent to enter the residence, nonetheless, the officers entered the residence.

Murray testified that he heard the officers hit a door inside his house and then heard the officers shouting at Joseph. He then saw the officers place Joseph under arrest and remove him from the residence. After Joseph was arrested, Murray signed a consent to search form. Murray testified that he was also arrested and taken to the police station on unrelated charges that were later dismissed.

At the hearing, Murray confirmed his cellular phone number and confirmed that he has used the same number "for years." He further recognized the second number Attorney Becker had used to reach him as his father's number, which he says he provided at the time of his arrest so officers would contact his father for him. Murray could not recall with certainty whether he received a call from Joseph's trial attorney, but he remembers that he did not receive a voicemail from an attorney. Murray also testified that after his arrest, he stopped staying at the house as he was not comfortable sleeping at the residence and began sleeping at his girlfriend's house.

Murray testified that if called in 2015, he would have testified then consistently with the testimony he gave at the hearing, and that there was no reason he would have avoided testimony. He acknowledged that he did not proactively reach out to Joseph to offer his supportive testimony, as he had his own problems going on as a result of the arrest on the day of the search. When he was asked by Joseph's brother about what happened, he states that he told him, and provided pictures from his phone of the damage caused to his door by the Detectives making entry into the bedroom.

### 3. Brittany Harris

Brittany Harris testified at the continued evidentiary hearing on February 27, 2020. She testified that in 2015, she was living in Miami, working as a dancer at a club, and taking a course to obtain a bartending certification. Harris met Joseph at the club she where worked but was never intimately involved with him.

Harris testified that she had been drinking with Joseph on the night of June 4, 2015. Eventually, Harris and Joseph arrived at the residence in the early morning of June 5, 2015. Harris does not recall seeing weapons or drugs in Joseph's bedroom and answered in the affirmative when Movant's counsel asked if she would have left if she had seen either. She testified that she fell

asleep in Joseph's bed and does not recall whether Joseph fell asleep next to her. She woke up to banging on the bedroom door. She testified that the bedroom door was not open and that she does not recall what Joseph did or if he was in bed with her when the police came into the room. Harris explained that they had been drinking, that she was tired, and ultimately, she testified that she did not know what Joseph had done.

Harris testified that after Joseph was arrested, the officers told her to contact them; she was later interviewed by the officers. She testified that she does not remember whether she was ever contacted by Joseph's attorney, and could not remember if she spoke to a lawyer.

### 4. Jean Baptiste Joseph

Movant Joseph testified at the continued hearing on February 27, 2020.  Joseph testified that he gave Becker information about witnesses Murray and Harris. He testified that he gave his attorney Murray's contact information and denied that Becker told him she was having trouble reaching Murray. Significantly, Joseph did not testify that he told Becker what Murray would say about the search if he was called. Joseph did not testify about the events surrounding his arrest or the contested search at all.

Joseph testified that attorney Becker had explained to him that they did not want Harris to testify at the suppression hearing, and she would reserve Harris as a witness at trial. Joseph did not testify that he disagreed with Becker's decision not to call Harris at the hearing.

## II.    STANDARD OF REVIEW

A prisoner is entitled to relief under 28 U.S.C.  § 2255 if the court imposed a sentence that (1) violated the United States Constitution or the laws of the United States; (2) exceeded its jurisdiction; (3) exceeded the maximum authorized by law; or (4) is otherwise subject to collateral attack. See 28 U.S.C. § 2255; *McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011).

Joseph raises claims challenging both trial and appellate counsel's effectiveness. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel during criminal proceedings against them.[9] *Strickland v. Washington*, 466 U.S. 668, 684 (1984).

To establish a claim of ineffective assistance of counsel, a movant must show that his attorney's performance was deficient and that the deficient performance prejudiced movant. *Strickland*, 466 U.S. at 687. To demonstrate that counsel's performance was deficient, a movant must show that in light of all the circumstances, counsel's performance was outside the bounds of professional competence. *See Cummings v. Sec'y or Dep't of Corr's*, 588 F.3d 1331, 1356 (11th Cir. 2009) ("To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place."). The test for ineffective assistance of counsel is not whether counsel could have done more, instead the test is whether what counsel did was within the wide range of reasonable professional assistance. *Chandler v. United States*, 218 F.3d 1305, 1313 n.12 (11th Cir. 2000).

To establish prejudice, a movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. A court need not address both *Strickland* prongs if the movant makes an insufficient showing of one of the prongs. *Id*. at 697. A court must also adhere to a strong

---

[9] There is no right to counsel for post-conviction collateral proceedings, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Counsel for Movant sought a continuance of the evidentiary hearing on the first day of the scheduling hearing and argued that without time to meet with Joseph, she would be forced to render ineffective assistance. Because there is no right to counsel, effective or otherwise, in this proceeding, counsel's argument was legally misplaced. Notwithstanding, the undersigned set a second hearing date to afford counsel additional time to meet with Movant and prepare.

presumption that counsel's conduct was within the range of reasonable professional assistance. *Id*. at 689.

Moreover, a movant must provide factual support for his contentions regarding counsel's inefficient performances. *Smith v. White*, 815 F.2d 1401, 1406–07 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy both *Strickland* prongs. *Boyd v. Comm'r, Ala. Dep't of Corr's*, 697 F.3d 1320, 1333–34 (11th Cir. 2012).

## III.   DISCUSSION

### 1.   Ineffective Assistance of Counsel for Failure to Present Witnesses

To allege a facially sufficient claim of ineffective assistance of counsel for failure to call a witness, the movant must state: (1) the identity of the witness; (2) the substance of the witness's testimony; (3) how the omission of this testimony prejudiced the outcome of the case; and (4) that the witness was available to testify at trial. *Haag v. Sec'y, Dep't of Corr.*, No. 8:14-CV-1794-T-35AEP, 2017 WL 6550884, at *9 (M.D. Fla. Sept. 25, 2017).

It is well recognized that "the decision regarding whether to call certain witnesses to testify is a tactical decision that is not vulnerable to collateral review." *See United States v. Cross*, No. 8:03-cv-2376-T-17MAP, 2005 WL 8159784, at *3 (M.D. Fla. Mar. 21, 2005). A strategic decision to not call a witness amounts to ineffective assistance of counsel, "only if it was so patently unreasonable that no competent attorney would have chosen it." *Id*. (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)); *see also Jordan v. McDonough*, No. 6:06-cv-1446, 2008 WL 89848, at *5 (M.D. Fla., Jan. 7, 2008). "Where ineffective assistance is based on counsel's failure to call a witness, the burden to show prejudice is heavy because 'often allegations of what a witness would have testified to are largely speculative.'" *Holt v. Sec'y, Fla. Dep't of Corr.*, 489 F. App'x 336, 338 (11th Cir. 2012) (quoting *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir.

2006)).

### a. Dewayne Murray

Joseph contends trial counsel was deficient for failing to call Murray to testify at the suppression hearing; Joseph avers that Murray was available to testify and his testimony would have discredited the detective's testimony that Murray gave consent to search the house and that he informed them that Joseph was in the home.

The undersigned finds from the evidence adduced at the hearing that Murray was not available for counsel to call at the suppression hearing. Notwithstanding his testimony that he would have testified if called, Murray did not reach out to offer his availability to Joseph, his counsel or family, and it is without dispute that counsel was unsuccessful in locating Murray. Because Joseph "cannot establish ineffective assistance of counsel based on counsel's failure to call a witness who is unavailable," his claim fails on this ground. *See Evans v. State*, 995 So. 2d 933, 943 (Fla. 2008) (rejecting claim of ineffective assistance of counsel because counsel took reasonable efforts to locate the witness and was unable to find him) (cited with approval by *Rizo v. United States*, No. 03-20010-CIV, 2014 WL 7152755, at *18 (S.D. Fla. Dec. 15, 2014), *aff'd*, 662 F. App'x 901 (11th Cir. 2016)).

To the extent Joseph now claims that counsel's efforts to investigate Murray were deficient, I similarly find that the evidence shows counsel met and exceeded reasonable efforts to locate Murray. Effective assistance of counsel includes the right to adequate pretrial investigation. *McCoy v. Newsome*, 953 F. 2d 1252, 1262 (11th Cir. 1992); *see also Streeter v. United States*, 335 F. App'x 859, 863 (11th Cir. 2009) ("An attorney has a duty to conduct reasonable investigations or to make a reasonable decision that renders a particular investigation unnecessary."). "There is no absolute duty to investigate particular facts or a certain line of defense, although a complete

failure to investigate may constitute deficient performance of counsel in certain circumstances." *Streeter*, 335 F. App'x at 863. Counsel's performance will not be deemed ineffective because she decided to "not pursue a particular line of defense without substantial investigation, so long as the decision was reasonable under the circumstances." *Id.* at 863–64.

Joseph's trial counsel did investigate Murray and made reasonable efforts to locate Murray prior to the suppression hearing. At the evidentiary hearing, attorney Becker testified that in 2015 all she knew about Murray was that he was the owner of the residence where Joseph was arrested, that it was reported he consented to the initial search of the residence, and that he executed a consent form permitting officers to conduct a second search of the residence. This testimony is consistent with Joseph's testimony that he told Becker that Murray was a potential witness. Becker testified that Joseph did not tell her about the substance of Murray's potential testimony, namely, that he would say he had not consented to the initial search. Becker also stated that she requested his phone number from Joseph and was unable to obtain it. Nonetheless, Becker found Murray's contact information through an Accurint search and called Murray. Becker also attempted to personally find Murray as she drove to his residence on two occasions. Becker testified that she contacted Murray's mother in an attempt to speak to Murray and also sent an investigator to his mother's residence in West Palm Beach, and tried to reach him through his defense counsel, all to no avail.

At the evidentiary hearing, Murray testified that he did not remember receiving a call from an attorney, but testified with confidence that he did not receive a voicemail. Crediting Murray's testimony as I do, and thus finding that counsel did not leave him a voicemail message, his testimony does not refute the evidence that Becker attempted to reach Murray by phone. Her file memorialized both telephone numbers that she used to call him and notes recording those attempts.

17

Moreover, I credit Becker's testimony regarding the other efforts she made to contact Murray, including attempting to find him at the house. Considering Murray's testimony that he stopped staying at the house after his arrest, the fact that she did not find him there is not surprising. Counsel's efforts to locate this witness were reasonable and not deficient.[10]

Joseph contends that counsel could have and thus should have done more to find Murray. His reliance on *Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994) is misplaced as counsel's efforts here cannot be compared to that which led the court to find that counsel was ineffective for failing to investigate alibi witnesses. In *Bryant*, counsel learned of the three alibi witnesses during a pretrial conference. The court explained that counsel was ineffective because he took no steps to contact the witnesses despite learning their identities and what petitioner believed they would testify; nor did he make a record to the court of the newly-discovered alibi witnesses. By stark contrast, attorney Becker's efforts to find and interview Murray were extensive, despite not knowing what testimony he could offer. Becker testified that all she knew in 2015 was that Murray was the owner of the residence and that he had signed a form consenting to the search of his house. Joseph did not contradict her testimony or offer any evidence that he informed his attorneys that Murray did not consent to the initial search or that he did not tell the officers that Joseph was home.

Moreover, to the extent that Joseph argues that Becker's attempts to locate Murray could have been better, that inquiry is subjective, and the Court need only determine whether her efforts were objectively reasonable. *McCoy*, 953 F.2d at 1263.

Similarly, Becker's decision not to call Joseph was reasonable as she testified that she did not want to call him without knowing what he would say on the stand. *See Calhoun v. Forniss*, No. 2 :14-cv-1228, 2017 WL 1352530, at *5–6 (M.D. Ala. Feb. 9, 2017) (finding counsel's

---

[10] Considering too that they were undertaken without the benefit of knowing what testimony the witness might provide, counsel's efforts are more aptly described as exceptional.

decision to not call a witness who stated she did not want to participate in the petitioner's defense reasonable because counsel did not know what the witness would say if called to testify).

Movant's claim fails to meet the first prong of the *Strickland* test; accordingly, it should be denied. *See Rizo v. United States*, No. 03-20010-CIV, 2014 WL 7152755, at *18 (S.D. Fla. Dec. 15, 2014), *aff'd*, 662 F. App'x 901 (11th Cir. 2016).

### b. Brittany Harris

Joseph contends that counsel was deficient for failing to call Brittney Harris at the suppression hearing as she would have contradicted the Detectives' testimony that they saw Joseph in the hallway and flee into his room. (*Id.* at 10). Specifically, Harris' affidavit in support of the Motion avers that Joseph was in bed next to her when police forced open the closed bedroom door, and that no weapons or drugs were in plain view in Movant's bedroom. (*Id.*). The evidence adduced at the hearing does not substantiate Joseph's claim and demonstrates that counsel's decision not to call Harris was reasonable.

Complaints of uncalled witnesses are disfavored in part because the presentation of witnesses is a matter of trial strategy. *Miranda v. United States*, 433 F. App'x 866, 869 (11th Cir. 2011). "Which witnesses to call, if any, and when to call them, is the epitome of a strategic decision that will seldom, if ever, serve as grounds to find counsel constitutionally ineffective." *Id.* (internal quotations omitted). In order to show that counsel's conduct was unreasonable, a movant must show that no other competent counsel would have taken the same course of action. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000).

Having received testimony from both attorney Becker and Ms. Harris, I largely credit both witnesses' testimony. Becker interviewed Harris and testified that she believed Harris would testify that Joseph was in the bedroom when the police came in; and that there were no weapons

or drugs in plain view. Notwithstanding, Becker explained that she did not call Harris as a witness at the suppression hearing for several reasons. First, Becker articulated her concern that if she testified at the suppression hearing, Harris's value as a trial witness might have been diminished because she could be impeached with any inconsistent statements she made between the two proceedings. Ultimately, Becker testified that she ultimately decided against calling Harris as a witness because she had some concerns regarding Harris' competence as a witness, specifically, her ability to recall the events of the morning Joseph was arrested. And finally, Becker explained that she viewed Harris' testimony as unnecessary at trial because she was able to introduce the recorded call that established the same facts as Harris' live testimony.

Becker's testimony demonstrates that her decision to not call Harris as a witness was for strategic reasons and was not patently unreasonable as she presented other evidence that she believed would be more beneficial to Joseph's defense. *See McCoy*, 953 F.2d at 1263 (finding that counsel's decision to not call an alibi witness at trial was reasonable because counsel determined, after interviewing two potential alibi witnesses, that neither witness could state affirmatively that they saw the petitioner the night of the crime); *Forrest v. Fla. Dep't of Corrs.*, 342 F. App'x 560, 563–64 (11th Cir. 2009) ("If counsel made the decision not to call Washington for strategic reasons—if for example, he spoke with Washington and decided that his testimony would not be helpful or that he would not make a credible witness—then this court would not provide relief for such strategic decisions by counsel.") (citing *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)). Counsel's election was not deficient.

Nor can Joseph show that he was prejudiced by counsel's decision not to call Harris, as her testimony at the evidentiary hearing did not reveal that she could competently say that there were no drugs or guns in plain sight in the bedroom, as law enforcement testified.. As noted above, I

credit Harris's testimony and found her to be a credible witness. This includes crediting her testimony that she had been drinking and remembered little about what she observed that night. More importantly, attorney Becker testified that she made the strategic decision to elicit Harris's observation that there were not drugs out in plain sight through the recorded call to Joseph, which in Becker's experience was the best evidence of that fact and superior to putting Harris up for cross-examination. Because the evidence for which Joseph contends counsel should have called Harris was in fact presented to the jury, he cannot show prejudice and his claim should be denied on this ground.

### 2. Ineffective Assistance of Trial Counsel At Sentencing

Joseph contends that his counsel was ineffective for failing to argue that under the rule of lenity, the Court should have applied Amendment 798, which he argues would have resulted in Joseph's sentence calculation without application of the career offender enhancement. At least if counsel had made the argument, Joseph urges, the issue would have been preserved and could have been presented on appeal under a *de novo* standard, as opposed to under a plain error standard of review. In response, the Government notes that counsel did in fact argue for the Court to apply the anticipated Amendment 798, though not predicated on the rule of lenity. The Government further contends that Joseph can show no prejudice from the error, as the Court's findings at sentencing demonstrate that the Court would have assessed the same sentence even without regard to the career offender enhancement. Joseph did not address the Government's points in Reply or in oral argument, but rather rested solely on the Motion.

Trial counsel did urge the court to apply Amendment 798, which was not in effect at that time, to give Joseph a lesser sentence outside of the guideline for a career offender. However, counsel did not advance the argument that the court should apply the Amendment under the rule of lenity, which means that the court "will not interpret a federal criminal statute so as to increase

the penalty that it places on an individual when such interpretation can be based on no more than a guess as to what Congress intended." *United States v. Wright*, 607 F.3d 708, 712 (11th Cir. 2010).

In this regard, counsel was not ineffective for raising the argument, as the Eleventh Circuit has never found that the rule of lenity is applicable to the Sentencing Guidelines. *See United States v. Wright*, 607 F.3d 708, 716 (11th Cir. 2010) (Pryor, J. and Fay, J., concurring). Notwithstanding, Joseph directs the Court to *United States v. Galviz*, 645 F.3d 347 (6th Cir. 2011), where the appellate court held that a court may apply the rule of lenity when interpreting the sentencing guidelines where there remains ambiguity or uncertainty. In *Galviz*, the court explained that there were two competing sections of the sentencing guidelines that would have been applicable to that defendant, and the rule of lenity required that the court apply the guideline that resulted in the lesser sentence. 645 F.3d at 362. Here, Joseph does not point the Court to two competing sections of the Guidelines, but rather argues that other circuits have decide that a previous conviction of battery on a law enforcement officer does not fall within the residual clause. An argument that the Eleventh Circuit struck down in Joseph's appeal. *See Joseph*, 700 F. App'x at 923.

Nor can Movant demonstrate that he was prejudiced by counsel's failure to make this argument, as the record reveals that the Court would have arrived at the sentence imposed whether or not the career offender enhancement was applied. *See Aguilar Meza v. United States*, No. 15-CV-24319, ECF No. 13 (S.D. Fla. June 13, 2016). Even if Becker had raised the argument that Amendment 798 be applied under the rule of lenity, the district court would not have applied a lesser sentence even without the career offender guideline: "I would impose that kind of sentence even if he were not a career offender." (CRDE 95 at 18). Accordingly, because the outcome of Joseph's sentencing hearing would not have changed had Becker made the rule of lenity argument, Joseph's claim of ineffective assistance of counsel must fail.

Neither was Joseph prejudiced by Becker's failure to preserve the challenge at the appellate level. While the appellate court noted that "[b]ecause Joseph failed to raise that argument to the district court, we review the issue only for plain error," *Joseph*, 700 F. App'x at 923 n.4, the Eleventh Circuit has also held that "under either *de novo* or plain error review, the district court's failure to apply Amendment 798 to [a defendant's] guidelines calculation was not error." *See United States v. McCalop*, 699 F. App'x 851, 853 (11th Cir. 2017) (rejecting a defendant's challenge to his sentence on the basis that the district court did not apply Amendment 798 because the amendment was a substantive change to the guidelines and would not be applied retroactively to sentences imposed prior to the Amendment going into effect).

Accordingly, counsel did not render inefficient performance of counsel by failing to raise this argument.

### 3. Ineffective Assistance of Appellate Counsel for Failure to Raise Eighth Amendment Challenge in Initial Brief

Joseph also argues that his appellate attorney rendered inefficient performance by failing to raise an Eighth Amendment claim to his 660–month sentence challenge in the initial brief appealing Joseph's sentence. In its response, the Government contends that appellate counsel cannot be ineffective for not raising a baseless claim.

A habeas petitioner claiming ineffective assistance of appellate counsel must succeed on both the performance and prejudice prongs of the *Strickland* test. *Farina v. Sec'y, Fla. Dept. of Corrs.*, 536 App'x 966, 979 (11th Cir. 2013). Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases; and will be deemed prejudicial only if "the neglected claim would have reasonable probability of success on appeal." *Id.* ("To determine whether there was prejudice, we must evaluate whether there was a reasonable probability that Mr. Farina's argument…would have won the day in 2001 on direct appeal.").

Thus, the question before the Court is whether appellate counsel's argument that Plaintiff's sentence violates the Eighth Amendment would have "won the day" in 2006 when Joseph initiated his direct appeal.

The Eighth Amendment "prohibits. . . sentences that are disproportionate to the crime committed." *Solem v. Helm*, 463 U.S. 277, 284 (1983). An Eighth Amendment challenge requires the reviewing court to consider two steps: first, whether the sentence imposed is grossly disproportionate to the offense committee; and second, if so, the court must consider the sentences imposed on others for commission of the same crime in that jurisdiction. *United States v. Theramene*, 517 F. App'x 789, 801 (11th Cir. 2013).

In support of his argument that his sentences are in violation of the Eighth Amendment, Joseph cites to *Theramene*, in which the Eleventh Circuit affirmed the petitioner's sentence of 240 months for drug trafficking and firearm offenses. Joseph's reliance on *Theramene* works against him, as the appellate court there noted the deference afforded to the sentences imposed by the trial courts. 571 F. App'x at 801 ("We have previously stated that, in non–capital cases, the Eighth Amendment encompasses only a narrow proportionality principle, and that successful challenges to the proportionality of sentences are exceedingly rare.") (internal quotations omitted). The appellate court held that the defendant had not shown that his sentence violated the Eighth Amendment because, as the trial court considered, he was a career offender, was convicted of a drug offense, and his initial guideline range was 360 months to life. *Id*. The court also rejected "Theramene's assertion that his sentence was grossly disproportionate as compared to the lower sentences that other defendants receive for more serious crimes, as the first step of our Eighth Amendment analysis only examines whether a sentence is grossly disproportionate to the offense actually committed." *Id*. at 801–02.

24

Here, as in *Theramene*, the trial court considered the seriousness of Joseph's offenses and his repeated violations of the law, as well as the sentencing guidelines for each offense. *See* Trans. Sentencing Hr. (ECF No. 9–5; 17:1–4) ("In fact, when you think about Count 3, the firearm, offense, it's five years to life. It's probably the most serious offense of them all. And it's a repeated offense."). That other defendants have received lesser sentences for similar offenses would not have compelled the Eleventh Circuit to vacate Joseph's sentences because the question of whether a sentence is disproportionate is not based on a comparison to other sentences but rather a review of whether the sentence is disproportionate to the offense committed, and the record demonstrates his sentences were not greatly disproportionate. *Theramene*, 517 F. App'x at 801; *see also United States v. Bowers*, 811 F.3d 412, 432–33 (11th Cir. 2016) *cert. denied*, 136 S. Ct. 2406 (2016) (affirming 182–year sentence for defendants convicted of brandishing a firearm during the course of multiple robberies and emphasizing that the Eleventh Circuit has never found a non–capital sentence of an adult to violate the Eighth Amendment."). Accordingly, Joseph's appellate counsel was not ineffective for failing to raise an Eighth Amendment challenge to his sentences because such a challenge would not have succeeded before the Eleventh Circuit.

## IV.    RECOMMENDATIONS

For the foregoing reasons, the undersigned recommends that Joseph's Motion to Vacate, Set Aside, or Correct a Sentence. (ECF No. 1) be **DENIED** and the Clerk of the Court be directed to close this case.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to file objections by that date shall bar the parties from *de novo* determination by

the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. *See* 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017).

**RESPECTFULLY SUBMITTED** in Chambers this 4th day of August, 2020.

_____

LAUREN LOUIS
UNITED STATES MAGISTRATE JUDGE

The Honorable Federico A. Moreno
Counsel of Record